560 So.2d 852 (1990)
J-O'B OPERATING COMPANY, Agent for the Former Stockholders and Employees of Jones-O'Brien Incorporated, Plaintiff-Appellee,
v.
NEWMONT OIL COMPANY, et al., Defendants-Appellants.
No. 88-1129.
Court of Appeal of Louisiana, Third Circuit.
March 14, 1990.
Rehearing Denied April 23, 1990.
Writ Denied June 29, 1990.
Thomas J. Wyatt, David L. Smelly, Shreveport, La., Charles R. Sonnier, Abbeville, La., for plaintiff-appellee.
Gordon, Arata, John M. McCollam, B.J. DuPlantis, Loulan J. Pitre, New Orleans, La., for Preston.
Scofield, Gerard, Veron, Hoskins & Soileau, John B. Scofield, David Hoskins, Lake Charles, La., for Newmont.
Ottinger & Gates, Patrick S. Ottinger, Lafayette, La., Stanley J. Krist, Houston, Tex., for Adobe.
Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Patrick G. Tracy, Jr., Lafayette, La., Woodley, Williams, Fenet, Palmer & Norman, James E. Williams, Lake Charles, La., Mansham, Hardy, Rolfs & Abadie, Charles R. Minyard, Lafayette, La., for Smith.
Before DOMENGEAUX, C.J., and GUIDRY and YELVERTON, JJ.
GUIDRY, Judge.
This matter was consolidated for trial with J-O'B Operating Company, Agent for the Traverse Group v. Newmont Oil Company, et al, our docket No. 88-1130. *853 The cases remain consolidated on appeal. The issues in both cases are identical and are disposed of in this opinion, however, we render a separate decree in the companion case.
This suit concerns the demand by certain parties who are either signatories or successors-in-interest to the original signatories to a certain 1979 letter agreement (AMI agreement) to be recognized as owners of fractional interests in a mineral lease granted by the State of Louisiana to Texaco Inc. (Texaco), State Lease 5419, which lease was sublet to Newmont Oil Company. Defendants, Newmont Oil Company (Newmont), Preston Oil Company (Preston) and C. L. Robinson (Robinson), appeal the decision of the trial court recognizing original plaintiff, J-O'B Operating Company as agent for the former stockholders and employees of Jones-O'Brien, Inc. (J-O'B), and the nominal defendants, Adobe Resources Corporation, successor to Adobe Oil & Gas Corporation (Adobe), Rebel Oil Company (Rebel), Quest Exploration & Development Company (Quest), Federated Energy Corporation (Federated) and Norman Smith, a former stockholder and employee of Jones-O-Brien, Inc., as owners of certain fractional interests in State Lease 5419, subject however, to the latters' indebtedness to Newmont for their proportionate share of the cost of the seismic program conducted by Newmont in connection with acquisition of the Texaco sublease. J-O'B, Adobe, Rebel and Smith answered the appeal asserting error in the trial court's determination that the expenses incurred in connection with a seismic program conducted by Newmont was part of the acquisition cost of the Newmont-Texaco sublease.
In the companion matter, J-O'B, as agent for the Traverse Group, makes the same demands against the same defendants. In this companion case, Adobe, Rebel, Quest, Federated and Louise Sparr Smith (a member of the Traverse Group) are named as nominal defendants. The trial court rendered judgment in this suit in favor of plaintiffs and the nominal defendants recognizing their ownership of fractional interests in the Texaco sublease, subject to their indebtedness to Newmont for their proportionate share of the seismic program costs. Appellants also appealed from this judgment. J-O'B, Adobe, Rebel and Louise Smith answered this appeal questioning correctness of the trial court's determination that the Newmont seismic program cost was part of the acquisition cost of the sublease.[1]
The issues presented on appeal are whether the trial court clearly erred in its findings that (1) the seismic program undertaken by Newmont was part of the acquisition cost of the Texaco sublease; and, (2) J-O'B, Adobe, Rebel, Norman Smith and Louise Sparr Smith complied with the AMI agreement by timely and properly electing to participate in the sublease.

FACTS
This dispute involves rights arising under a 1979 letter agreement entered into by the parties to this litigation or their ancestors in title. The agreement created an area of mutual interest and mandates that any party who acquires an interest in a mineral lease within the AMI is obligated to offer the non-acquiring parties the option to participate in the acquisition by paying to the acquiring party their proportionate share of all "out-of-pocket acquisition costs". State Lease 5419 is located within the boundaries of the AMI. This lease was acquired by Texaco in the year 1969. The State lease has been maintained in force and effect beyond its primary term by mineral production from a unit which included approximately 10 acres out of State Lease 5419. In late 1984, the Louisiana State Mineral Board (Mineral Board) began to pressure Texaco for further development of the lease. Upon learning of the State's demand, Newmont began negotiations with Texaco seeking a sublease. Newmont initiated the negotiations by offering to conduct a seismic program as *854 consideration for the granting of an optionsublease.
As a result of its negotiations with Newmont, Texaco was able to secure deferral of the Mineral Board's consideration of State Lease 5419 to September 3, 1985. The Newmont-Texaco negotiations culminated in the sublease, which was entered into in late June, 1985, with an effective date of July 2, 1985. The grant of the sublease was made contingent upon the Mineral Board's grant of a further extension from September 3, 1985. Representatives of Newmont and Texaco appeared before the Mineral Board Fact Finding Committee on July 2, 1985. After reviewing the seismic program offered by Newmont, the Committee recommended to the Mineral Board that the September 3 deadline be extended to February 4, 1986. On August 14, 1985, the Mineral Board accepted the Committee's recommendation and extended the deadline for review of State Lease 5419 to February 4, 1986.
We digress at this point to note that during the negotiations, Newmont provided the AMI participants with reports outlining the progress being made towards the grant of a sublease. The record makes clear that all participants were aware that Newmont was adamantly determined to conduct a seismic program before committing to the drilling of a deep well on State Lease 5419. By the same token, as early as March 1985, the plaintiffs, Adobe and Rebel, raised questions concerning the extent of and the necessity for the seismic program proposed by Newmont.
On July 3, 1985, Newmont wrote to the AMI members, enclosing a copy of the sublease and the proposed seismic program, informing them of the recommendation of the Committee and requesting their decision on whether or not each wished to participate in the sublease. The letter stated:
"Pursuant to the provisions of the February 21, 1979 Operating Agreement, please inform Newmont, within 15 days of receipt of this letter, of your election to participate or to not participate in the Sublease Agreement. You should understand that a decision to participate will also be your agreement to participate in the costs of the Proposed Seismic Program agreed between Texaco and Newmont and approved by the State Mineral Board, as well as your share of expenses incurred to-date by Newmont associated with the Sublease Agreement and the Proposed Seismic Program. Should each of you elect to participate, your respective interest in the Sublease Agreement will be as follows:

 OWNER INTEREST
Adobe Oil and Gas Corporation 27.000000
Quest Exploration & Development Co. 4.250000
Preston Oil Company 16.086966
Rebel Oil Company 3.000000
Newmont Oil Company 6.000000
J-O'B Group 34.000000
Traverse Corporation
Group 9.663034
 ___________
 100.000000"

We observe at this point that the Newmont-Texaco sublease agreement, by its terms, does not specifically require that Newmont conduct a seismic program. Rather, the agreement simply provides that, "Second Party (Newmont) has the right to conduct seismic operations across the subleased premises for a period of one hundred fifty (150) days from the effective date of this agreement".
J-O'B, as agent on behalf of the former stockholders and employees of Jones-O'Brien, Inc. (including Norman Smith), timely responded that they elected to participate in the sublease, were willing to pay their proportionate share of the acquisition costs but would not pay for the seismic program since it was not required by the sublease nor was it a condition for the approval of the sublease by the Mineral Board. Notwithstanding the above, J-O'B informed Newmont that if Newmont could establish that the seismic program was, in fact, an acquisition cost of the Texaco sublease, it would pay its proportionate share of such cost. J-O'B, as agent for the members of the Traverse group (other than Federated and Robinson, both of whom contacted Newmont personally) responded *855 likewise. Adobe and Rebel responded in a like vein, timely informing Newmont that they did not see the election to participate in the sublease and to pay for the seismic program as indivisible. Each elected to participate in the sublease but declined to share the cost of the seismic program since the sublease did not state that the seismic program was a specific consideration for the sublease nor did the document obligate Newmont to conduct same. Preston, Quest, Robinson and Federated elected to participate without contesting Newmont's right to be reimbursed for cost of the seismic program. Newmont wrote back to J-O'B, Adobe and Rebel requesting clarification of their decisions and stated again that the seismic program was the primary consideration for the sublease and indivisible from it. J-O'B, Adobe and Rebel repeated their responses and again requested proof to support Newmont's contention. Further, Adobe and Rebel urged that the proposed program was excessive. J-O'B requested a meeting between all of the parties to the 1979 letter agreement to resolve the matter. Newmont did not respond to either suggestion.
Correspondence continued between the parties over the consideration for the sublease and J-O'B, Adobe and Rebel's elections to participate. On November 26, 1985, J-O'B wrote to Newmont demanding assignment of their interests in the sublease. They also agreed to commit to a well on the leased acreage. In the letter, J-O'B proposed to escrow their proportionate share of the seismic costs and submit the matter to binding arbitration. Newmont declined, responding with a chronology entitled "Sequence of Events" outlining their negotiations with Texaco and a copy of a letter sent by them to Texaco denying J-O'B's interest in the sublease.
In early December, Newmont committed to Texaco to drill a well on State Lease 5419. In January of 1986, J-O'B filed this suit and the companion matter. Adobe, Rebel and the Smiths were made nominal defendants as necessary parties for a full resolution of the matter. In March of 1986, the nominal defendants, Adobe, Rebel and Norman Smith, cross-claimed seeking the same relief as the plaintiff, J-O'B. Louise Sparr Smith filed similar crossclaims in July 1986. A well was commenced on State Lease 5419 in May of 1986 and successfully completed in March of 1987.
The two cases were consolidated for trial and the parties were aligned as follows:
Plaintiffs Defendants
J-O'B as agent for the former Newmont
stockholders and employees of Jones Preston
O'Brien, Inc. (except Norman Smith) Robinson
J-O'B as agent for the Traverse
Group (except Louise Sparr Smith,
Federated and Robinson)
Norman Smith
Louise Sparr Smith
Adobe
Rebel
Quest
Federated
Quest and Federated stipulated that they had no interest in the outcome of these suits and did not challenge the position of any party. Trial was had following which the trial court concluded that all plaintiffs properly elected to participate in the Newmont-Texaco sublease and that the seismic program undertaken by Newmont was a proper acquisition cost of the sublease. Accordingly, the trial court ordered specific performance, i.e., a transfer to plaintiffs and nominal defendants by defendants of proportionate interests in the Texaco sublease, the fractional interests being fixed by stipulation of the parties. The trial court also found plaintiffs and nominal defendants indebted to defendants for their proportionate share of the seismic program, the total sum being subject to audit. Costs were apportioned among all parties in designated percentages. Defendants appealed.

ISSUES
I. Was the seismic program conducted by Newmont an "out-of-pocket acquisition cost" of the Texaco sublease under the AMI agreement?
The trial court found the seismic program to be an obligatory cost incurred by Newmont, without which it would not have acquired the Texaco sublease. The *856 trial court, in its reasons for ruling, concluded that the Mineral Board Fact Finding Committee expected that the seismic program offered by Newmont would be conducted and that Newmont was obligated to conduct the seismic program. Further, correspondence between Newmont, Texaco and the Mineral Board confirmed that Newmont would, in fact, conduct the offered seismic program. The trial judge found that, while the sublease could have been more specific in defining the consideration for its execution, Newmont was open with the other AMI members about their negotiations with Texaco from the beginning and as early as January 1985, the members were aware that a seismic program was part of the deal if finally consummated. The trial court noted that in accepting Newmont's offer Texaco struck through a clause in the sublease that would have allowed Newmont to recover the expenses of the seismic program should a successful well be drilled. The trial judge found this corroborative that the seismic program was the actual consideration for the sublease stating:
"One of the witnesses, when questioned on this point, stated that he didn't know why Texaco would refuse such a recovery to Newmont. But the Court finds a reasonable and obvious reason. This would have allowed Newmont to recover the very consideration it had paid for the Sublease, and, in effect, get it for nothing."
We find ample support in the record for the trial court's conclusion. In spite of the permissive rather than obligatory provisions of the sublease regarding seismic work, the record clearly reflects that Newmont's obligation to conduct the seismic program was the principal consideration for the sublease. At the outset and throughout its negotiations with Texaco, Newmont offered a seismic program as consideration for the grant of a sublease. At the July 2, 1985 meeting of the Fact Finding Committee, Newmont's proposed seismic program was explained in detail. According to the testimony of those present at the meeting representing Newmont, Texaco and the State, and other documentary evidence, based upon Newmont's presentation at the meeting and the commitment by Newmont to conduct the seismic program and provide the Mineral Board with the seismic data developed, the Mineral Board ultimately extended the September 3, 1985 development date to February 4, 1986, a requisite for the continued viability of the sublease agreement. Paragraph 25 of the sublease made continued viability of the sublease contingent upon the Mineral Board deferring the September 3, 1985 drilling obligation, the agreement providing that, in the absence of such deferment, the sublease would terminate and be of no further force and effect. This, in our view, clearly confirms that the seismic program was the principal consideration for the sublease, since without Newmont's commitment to that program there would have been no extension and no sublease.
Appellees argue to the contrary, pointing to the fact that a seismic program is not specifically required but only permitted by the terms of the sublease. We find no force in this argument. Under the AMI agreement, Newmont is entitled to recover its acquisition costs. The record confirms that the seismic program is a legitimate acquisition cost. Therefore, irrespective of the provisions of the sublease under the AMI agreement, if appellees validly elected to participate in the acquisition of the Texaco sublease, each must bear a proportionate share of the seismic costs.
II. Did appellees timely and properly elect to participate in the Texaco sublease?
The trial court concluded that appellees timely and properly elected to participate in the Texaco sublease, although they contested Newmont's right to reimbursement for the seismic program costs and in fact refused to pay same. In making this determination, the trial court reasoned as follows:
"... The electing party is free to contest any costs which it thinks is not required. The Agreement does not say that the party electing to participate must pay all costs claimed by the offeror.

*857 Plaintiff can pay the seismic costs now and participate in the well and Sublease because they accepted properly and the confusion was caused, not by plaintiffs' equivocal election, but by Newmont's poorly worded Sublease. Newmont could have avoided these problems and controversies by clearly stating in the Sublease that it was granted by Texaco in consideration of Newmont's obligation to conduct the seismic program.
Additional [sic], plaintiffs are not in default of the payment for the seismic, since Newmont did not send a proper bill to the plaintiffs as required by the agreement.
And further, paragraph XVI B of the AMI Agreement obligates the party exercising the option to participate to do so
`by paying' its part of the consideration `paid', however, at the time of the election to participate by the plaintiffs, no part of the seismic costs had yet been paid."
For the reasons which follow we find clear error in the trial court's determination that appellees timely and properly elected to participate in the sublease of State Lease 5419.
The AMI agreement provides that a party can elect to participate in an acquired interest as follows:
"The lands outlined in red on the Plat attached to the Operating Agreement shall comprise an Area of Mutual Interest between the parties hereto. It is specifically agreed and understood that if any party hereto or its assigns shall acquire any oil, gas or mineral lease within the Area of Mutual Interest or the right of option to acquire same during the term of this agreement, then such acquiring party shall forthwith after such acquisition furnish the other party hereto with a reproduced copy of the signed instrument whereby such interest was acquired, together with all of the details with reference to the consideration paid. The party receiving such notice shall have the option for a period of fifteen (15) days after receipt of notice within which to elect to participate in the acquisition, subject to the terms on which the interest was acquired, in the following proportions:
Jones-O'Brien 40%
Participants 60%
by paying the acquiring party its proportionate part of all out-of-pocket acquisition costs."
Newmont began negotiations with Texaco in early 1985. Newmont's initial offer to Texaco by letter dated January 8, 1985, was for the grant of a sublease in consideration of Newmont conducting a seismic program within 150 days from the effective date to such a degree as would be sufficient to determine the prospective potential of the subleased premises and, if so determined to be prospective, the optimum location of a well. Although not required to do so by the AMI agreement, Newmont kept all parties informed as negotiations toward a sublease progressed. In early correspondence, J-O'B and Adobe specifically referred to Newmont's offer to Texaco as a "seismic option". The whole tenor of all correspondence between Newmont and Texaco, most if not all of which was transmitted to the AMI parties, was to the effect that Newmont would conduct a seismic program as consideration for the sublease, with the option, after completion of the program, to drill a well or reassign the lease to Texaco. Although early on appellees indicated their disagreement with the necessity for and/or the scope of Newmont's proposed seismic program, Newmont was the principal negotiating with Texaco and, under the AMI agreement, was free to negotiate on such terms and conditions which it considered reasonable, without any obligation to structure the agreement in accord with the wishes of any of the parties to the AMI agreement. Newmont's obligation to the AMI parties, after confection of the sublease, was to offer participation by forwarding a reproduced copy of the signed instrument whereby such interest was acquired, together with all details with reference to the consideration paid. The party receiving notice had the option for 15 days after receipt of notice to elect to participate "by paying the acquiring party its proportionate part of all *858 out-of-pocket acquisition costs". AMI parties had no right to alter the agreement or to elect to participate on terms which such party considered more reasonable. In other words, to preserve their right of participation, the AMI member was required to elect to participate in the precise agreement ultimately confected between Newmont and Texaco and to do so within fifteen days of receiving notice. Newmont complied with its obligation under the AMI agreement when, on July 3, 1985, it wrote to all interested parties forwarding a copy of the sublease, a copy of the proposed seismic program and correspondence between Newmont, Texaco and the State Mineral Board, together with details of the consideration as follows:
"You should understand that a decision to participate will also be your agreement to participate in the costs of the Proposed Seismic Program agreed between Texaco and Newmont and approved by the State Mineral Board, as well as your share of expenses incurred to-date by Newmont associated with the Sublease Agreement and the Proposed Seismic Program."
J-O'B's response was to elect to participate in the sublease, but to decline to pay a proportionate share of the seismic program since it was not required by the terms of the sublease, unless and until Newmont could establish that the seismic program was in fact a consideration for the sublease. Adobe and Rebel's responses were in the same vein, electing to participate in the sublease but refusing to contribute to the seismic costs because there was no specific language within the operating agreement or sublease which made the sublease and proposed seismic program inseparable. Following the July 3rd offer and appellees' responses, Newmont made repeated efforts through correspondence seeking to convince appellees that the seismic program was the consideration for the sublease and was in fact the catalyst for the Mineral Board's extension of the development date to February 4, 1986, a requisite for the continued viability of the sublease. Newmont's efforts fell on deaf ears.
The consideration for the sublease is set forth in general terms in paragraph 3 as follows:
"The consideration for this agreement is the mutual benefits and advantages accruing hereunder and the covenants, agreements and obligations of the parties, the receipt and adequacy of which is hereby acknowledged and full acquittance granted therefor."
No money changed hands between the parties to the sublease. Under the agreement Newmont was not required to commit to the drilling of a well but could on or before December 30, 1985 elect not to do so and reassign the lease to Texaco. These facts being conceded, it is reasonable to conclude that the true and only consideration for the sublease was Newmont's commitment to conduct the seismic program, which in turn allowed a deferment of Texaco's obligation to the Mineral Board until February 4, 1986. The fact that the sublease agreement grants Newmont the right to conduct seismic operations on the leased premises, rather than specifically requires the performance of that obligation, is not, in our opinion, decisive of the issue of what actual consideration prompted the grant of the sublease. This is especially so in light of the extensive negotiations which were conducted over a long period of time and the fact that all parties were privy thereto.
The sublease agreement was prepared by Texaco on one of its standard forms. As the trial judge noted in his written reasons for judgment:
"As to the argument of plaintiffs that the sublease didn't say that the seismic was required by rather that it was permitted, the Court agrees with Newmont's position that why should it insist on `must' when Texaco was satisfied with `may'."
Appellees are shown by the record to be experienced oil and gas operators. As such, appellees were cognizant of the fact that it is common practice for the consideration for transfers of mineral interests to be couched in general terms, for example "$10 and other good and valuable consideration". The AMI agreement recognized *859 this by requiring the offeror to provide a copy of the agreement establishing the interest and "details with reference to the consideration paid".
The trial court concluded that the seismic program was an obligatory cost, without which Newmont would not have acquired the sublease from Texaco. The trial court reached that conclusion based upon the very same evidence which was furnished to appellees by Newmont, or which, if not furnished, was readily available to them. We are able to affirm the trial court's conclusion on this issue with little difficulty.
In making their equivocal election to participate in the sublease, appellees seemingly totally ignored the information and data furnished by Newmont before and after its offer of July 3, 1985. Without conducting any sort of inquiry on their own, if they felt such was necessary, appellees were content to rely solely on the fact that the sublease, by its terms, made the conducting of a seismic program permissive rather than obligatory, and accordingly that they would not agree to pay a proportionate share of the seismic program unless and until Newmont proved that the seismic program was an "out-of-pocket cost". The AMI agreement does not require the offeror to prove beyond peradventure what consideration was paid for the acquisition of a mineral interest but only to furnish details with reference to the consideration paid. Newmont complied with its obligation by furnishing such details with supporting documentation.
We likewise disagree with the trial court's conclusion that appellees should now be allowed to participate because Newmont failed to send a proper bill to appellees and no part of the seismic costs had been paid or incurred when the offer to participate was made. These conclusions are derived from too literal a reading of the AMI agreement.
Under the AMI agreement Newmont was obligated to inform the parties of the acquisiton cost of the sublease in order that such parties might make an informed election whether to participate or not. Newmont was committed to Texaco and the State to conduct the seismic program as consideration for the sublease. The proposed program offered and accepted by both Texaco and the State was extensive and very expensive, a fact known by all parties to this suit. The program ultimately cost in excess of $400,000.00. This expense was a certainty and, contrary to the contentions of Adobe and Rebel, was inseparable and indivisible from the sublease such that the parties were informed, "a decision to participate will also be your agreement to participate in the costs of the Proposed Seismic Program". The record reflects that appellees constantly refused to contribute their proportionate share of the seismic costs and to this date, by answer to this appeal, question the trial court judgment which casts them for their share of such cost. Thus, it goes without saying, that for Newmont to have sent a bill would have been a vain and useless act.
The trial court held that an electing party is free under the AMI agreement to contest any costs it deems unneccessary. From this premise, the trial court reasoned that plaintiffs could pay the seismic costs now and participate in the sublease. We disagree.
The AMI agreement does not allow an electing party the right to contest the necessity for or the extent of any consideration paid by the acquirer for a lease or other mineral interest. As aforestated, Newmont was free to negotiate with Texaco on such terms and conditions as it considered reasonable. Newmont had no obligation to structure the agreement so as to satisfy any AMI party, its only obligation being to offer participation on the terms finally agreed upon. Further, we disagree that appellees should be permitted to now participate upon payment of their share of the seismic costs. The agreement allowed appellees' election to participate for a period of fifteen days after receipt of notice. Appellees did not unequivocally accept Newmont's offer within the required period and are not now entitled to accept. The AMI agreement does not authorize a conditional election to participate in an acquired *860 interest nor does our law sanction such practice. Our rule of law is expressed by Professor Litvinoff in Consent Revisited: Offer Acceptance Option Right of First Refusal and Contracts of Adhesion in the Revision of the Louisiana Law of Obligations, 47 La.L.Rev. 699, 737 (1987), as follows:
"Nevertheless, the absence of an express stipulation of the parties on a certain point must be clearly distinguished from their disagreement on that point, even if apparently nonessential. That is so because if the offer, besides the essential terms, also contains matters of detail, in order to be effective the acceptance must comply with all terms in the offer, whether essential or not. If the acceptance limits, conditions, or modifies the offer, it is itself considered a new offer and gives the one who made the original offer the right to withdraw it."
See also Keene v. Williams, 423 So.2d 1065 (La.1982).
Although unnecessary to our decision, we consider that an obvious inequity would result were we to decide otherwise. As a result of the equivocal responses from appellees to its offer of July 3rd, Newmont, together with the AMI parties who agreed to bear the acquisition cost of the Texaco sublease, Preston, Federated, Robinson and Quest, shouldered the entire burden of the seismic program and thereafter the risk of drilling the State Lease 5419 No. 1 Well, at a cost in excess of ten million dollars. Appellees who bore neither the expense nor the risk of the venture now seek to participate in the proceeds from a highly successful well.
For the above and foregoing reasons, the judgment of the trial court is reversed and set aside. It is now ordered, adjudged and decreed that plaintiffs' suit be dismissed. All costs at the trial level and on appeal are to be borne by J-O'B Operating Company, Adobe Resources Corporation and Rebel Oil Company.
REVERSED AND RENDERED.
NOTES
[1] Appellants do not question the judgments insofar as they allocate fractional interests in the sublease to Quest and Federated.